**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| LPJJ LLC, a business entity, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Versova Holdings, LLC, Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC., Hillandale Farms East, Inc., and Hillandale Farms, Inc, Daybreak Foods, Inc., Urner Barry Publications, Inc. d/b/a Expana, Egg Clearinghouse, Inc., United Egg Producers, and John Does 1-10. <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff LPJJ LLC ("Plaintiff") individually and on behalf of the Commercial Indirect Purchaser Classes defined below, brings this class action against Cal-Maine Foods, Inc. ("Cal-Maine"), Rose Acre Farms, Inc. ("Rose Acre"), Versova Holdings, LLC ("Versova"); Hillandale Farms, which is comprised of Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, LLC., Hillandale Farms East, Inc.; and Hillandale Farms, Inc (together "Hillandale Farms"); Daybreak Foods, Inc. ("Daybreak Foods"); Urner Barry Publications, Inc. d/b/a Expana ("Urner Barry" or "Expana"), Egg Clearinghouse, Inc. ("ECI"); United Egg Producers ("UEP"); and John Does 1-10 (together the "Defendants")  to recover treble damages, injunctive relief, and any other relief as appropriate, based on violations of the Sherman Act and various state antitrust and consumer protection laws.

**NATURE OF THE ACTION**

1.      Defendants have conspired to fix, raise, maintain, or stabilize prices for conventional fresh shell eggs ("Conventional Shell Eggs") from at least January 1, 2022, until Defendants' unlawful conduct and its anticompetitive effects ceases ("Class Period").

2.      Conventional Shell Eggs comprise most of the shell eggs sold in the United States. In 2024, almost three-quarters of the U.S. shell egg market constituted Conventional Shell Eggs. Other shell eggs include cage-free eggs (about 23.2 percent of the shell egg market), and pasture-raised (less than five percent of the shell egg market).

3.      Defendants Cal-Maine, Rose Acre, Versova, Hillandale, and Daybreak ("Egg Producer Defendants") are the five biggest egg producers in the United States and own almost half of all egg-laying commercial hens.

4.      Defendant and publisher Urner Barry collects, analyzes, and disseminates current information to its food industry customers in the egg, poultry, meat, seafood, plant protein, and related segments. Urner Barry provides actionable, competitive information related to the egg market to the Egg Producer Defendants and other egg producers.

5.      Egg Producer Defendants reported inflated assessments of egg prices to Urner Barry. Urner Barry then published price quotes using the information provided by its subscribers, including the Egg Producer Defendants. It also used transaction prices from Defendant ECI's private online spot market for egg trading.

6.      The limited transactions on the ECI, along with Defendants' significant size, allowed the Egg Producer Defendants to easily impact ECI volume and pricing, which in turn influenced the Urner Barry quote.

7. Urner Barry's price quotes set a benchmark for Defendants' Conventional Shell Egg sales, with Urner Barry and ECI intensifying price fluctuations initiated by the major producers and limiting independent pricing decisions by others. Defendants' manipulation of Urner Barry benchmarking allowed them to impose price increases on their customers.

8. Defendants attributed rising prices during the Class Period to Highly Pathogenic Avian Influenza H5N1 ("HPAI"), which caused the culling of millions of layer hens from late 2021. However, HPAI does not solely account for the egg prices increases observed during the Class Period. Instead, Defendants' blame on HPAI was and is pretextual, and neither HPAI nor input costs account for Conventional Shell Egg price increases over the Class Period. Relevant egg production inputs actually *fell* while egg prices continued to increase.

9. The shell egg industry is structurally susceptible to collusion, featuring a commodity product, highly concentrated and vertically integrated producers, high entry barriers, inelastic demand, and numerous opportunities to collude.

10. Egg prices dropped after March 2025, only when Defendants' alleged misconduct became public through the revelation of the Department of Justice's investigation of the industry for price fixing, with Cal-Maine, Rose Acre, and Urner Barry reportedly among those under scrutiny.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act. 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

12. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District, and Defendants have sufficient minimum contacts with the United States as a whole. Moreover, Defendant Daybreak Foods, Inc. has its principal place of business in this District. The Court also has personal jurisdiction over Defendants because they

purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed Conventional Shell Eggs into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Plaintiff paid unlawful overcharges for Conventional Shell Eggs and suffered antitrust injury within this jurisdiction.

13.    The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permit an antitrust lawsuit to be brought against a corporation in any district where the corporation may be found or transacts business and allow all process in such cases to be served in any district where the corporation may be found.

14.    Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. Defendants transacted business in this District, a substantial portion of the activity at issue in this case occurred in this District, Defendants' conduct, as alleged herein, caused harm to Class members in this District, and Defendant Daybreak Foods, Inc. is headquartered in this District.

15.    Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

16.    During the Class Period, Defendants processed and sold eggs in a continuous and uninterrupted flow of interstate commerce, which included the processing and sale of eggs in this District, advertisement of eggs in media in this District, and employment of sales personnel in this

4

District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

17. No other forum would be more convenient for the parties and witnesses to litigate this case.

18. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming Class members throughout the United States.

## PARTIES

### I. Plaintiff.

19. Plaintiff LPJJ LLC is a Michigan limited liability company with its principal place of business in Detroit, Michigan. During the Class Period, Plaintiff purchased Conventional Shell Eggs in Michigan indirectly from one or more Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Conventional Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

### II. Defendants.

#### Cal-Maine

20. Defendant Cal-Maine Foods, Inc., is a public company incorporated in Delaware with its principal place of business in Ridgeland, Mississippi.

21. Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

22.     Cal-Maine is the largest producer of eggs in the United States. In 2024, Cal-Maine had nearly 45 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is a fully integrated company with its operations consisting of hatching chicks, growing and maintaining chicken flocks, manufacturing feed, and producing, processing, packaging, and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion dozens of eggs sold.

23.     Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

24.     Cal-Maine subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

25.     During the Class Period, Cal-Maine sold Conventional Shell Eggs to purchasers in the United States, including members of the Commercial Indirect Purchaser Classes.

### *Rose Acre*

26.     Defendant Rose Acre Farms, Inc., is a private company incorporated in Indiana with its principal place of business in Seymour, Indiana.

27.     Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

28.     Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

29.     Rose Acre subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

30. During the Class Period, Rose Acre sold Conventional Shell Eggs to purchasers in the United States, including members of the Commercial Indirect Purchaser Classes.

*Versoza*

31. Defendant Versova Holdings, LLC, is a private company incorporated in Delaware with its principal place of business in Sioux Center, Iowa.

32. Versova is one of the largest egg producers in the United States. In 2024, it had over 18 million egg-laying hens.

33. Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon.

34. Versova subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

35. During the Class Period, Versova sold Conventional Shell Eggs to purchasers in the United States, including members of the Commercial Indirect Purchaser Classes.

*Hillandale Farms*

36. Defendant Hillandale Farms comprises several related companies, including Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc.—all incorporated in Pennsylvania—and Hillandale Farms, Inc., incorporated in Ohio. Hillandale Farms is headquartered in Gettysburg, Pennsylvania.

37. Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. In 2024, it had nearly 19 million egg-laying hens.

38. Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

7

39.    Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

40.    Hillandale Farms subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

41.    During the Class Period, Hillandale Farms sold Conventional Shell Eggs to purchasers in the United States, including members of the Commercial Indirect Purchaser Classes.

### Daybreak Foods

42.    Defendant Daybreak Foods, Inc., is a private company incorporated in Wisconsin with its principal place of business in Lake Mills, Wisconsin.

43.    Daybreak Foods is one of the largest egg producers in the United States. It produces approximately 16 million eggs per day. In 2024, it had over 20 million egg-laying hens.

44.    Daybreak Foods subscribed to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

45.    During the Class Period, Daybreak Foods sold Conventional Shell Eggs to purchasers in the United States, including members of the Commercial Indirect Purchaser Classes.

### Urner Barry

46.    Defendant Urner Barry Publications, Inc., is a private company incorporated in New Jersey with its principal place of business in Toms River, New Jersey. Urner Barry has published egg prices to industry participants, including the Egg Producer Defendants, during the Class Period.

47.    In 1976, Urner Barry hosted the very first Executive Conference in New Jersey, which became the most widely attended and recognized marketing event in the poultry and egg industries.

48.     Urner Barry created Comtell® On-Line ("Comtell"). Urner Barry claims that Comtell is "the most accessible, accurate and timely source for news, quotes and research" in the meat, poultry, pork, veal, seafood, and, critically for this case, egg industries. Comtell subscribers "are updated several times a day on the most impactful market conditions."

49.     Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, the U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations under a single brand name: Expana.

50.     The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

### *Egg Clearinghouse*

51.     Defendant Egg Clearinghouse, Inc., is a Delaware corporation with its offices and principal place of business located in Dover, New Hampshire.

52.     During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

53.     Only ECI members (i.e., farmers and egg buyers) are allowed to trade on the ECI marketplace.

54.     In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more than $600 million, were traded on the ECI online platform.

55.    ECI represents just 5% of the shell egg market but plays an outsized role in how eggs are priced nationwide.

### United Egg Producers

56.    Defendant United Egg Producers d/b/a Egg Farmers of America is a Maine corporation with its offices and principal place of business located in Johns Creek, Georgia.

57.    UEP is a national cooperative of egg farmers representing the ownership of approximately 95% of all the nation's egg-laying hens.

58.    The United Egg Association ("UEA") is a trade association affiliate with UEP. UEP formed UEA in 1983. UEA serves as a national trade association representing three distinct segments of the U.S. egg industry – further processors, allied members, and producers and packers.

### Unnamed Co-Conspirators and Other Non-Parties

59.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein: John Does 1-10. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

60.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

61.    Each corporate Defendant's agent operated under the authority and apparent authority of its respective principles.

62.    Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

63.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

64.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supra-competitive prices of Conventional Shell Eggs.

65.     Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### I.    Egg Production in the United States

66.     The U.S. egg industry produces about 100 billion eggs annually. In 2023, Americans each consumed more than 280 eggs on average.

67.     Poultry production starts with primary breeder flocks, which produce grandparent birds that generate parent flocks. These multiplier flocks' eggs hatch into broilers (for meat) and egg-laying hens (layers). Broiler chicks are sent to farms shortly after hatching, while hens grow on pullet farms before moving to egg production facilities.

68.     The egg production cycle is stable and predictable. Producers can precisely adjust output and, by collectively limiting supply or managing flocks, influence prices.

11

69. Egg producers use cold storage to manage inventory, allowing them to withhold eggs during low prices and releasing them when prices rise. These industry factors can easily foster anticompetitive coordination.

70. The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a comprehensive system of grading and sizing that ensures uniformity across the shell egg market. USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer.

71. The United States egg industry produces eggs for two primary uses: (a) whole shell eggs sold primarily to retail consumers (the "shell egg" or "table egg" market) and (b) pasteurized eggs sold without the shell in liquid or dried form primarily to restaurants, cafeterias, and food manufacturers (the "breaker" market). Historically, about 70% of layer hens produced eggs for the shell egg market, while the remaining 30% of layers produced eggs for the breaker market. A smaller but growing segment of the shell egg market involves "quality-differentiated" products—such as cage-free or organic eggs—that command retail premiums over Conventional Shell Eggs.

72. Eggs are produced nationwide, with most states contributing significantly. Production in the United States is concentrated in the Midwest. The top five egg producing states—Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented nearly half of all laying hens in 2024.

## II. Consolidation in the Egg Industry

73. Throughout most of the twentieth century the egg industry was highly fragmented with thousands of independent farms.

12

74.     Today the Egg Producer Defendants—Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods (referred to as the "Big Five")—collectively control approximately 40 percent of all U.S. laying hens. Defendant Cal-Maine alone had over 50 million egg-laying hens in 2024, and it controlled approximately 20 percent of national egg sales.

75.     Regional concentration is significant; the top four producers hold about two-thirds of California's egg-laying hens.

76.     The Egg Producer Defendants are also vertically integrated—they own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

77.     In addition to its 45 million layers and 49 egg production facilities, Cal-Maine hatches the majority of its chicks in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine transports them to its own production farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. After eggs are produced, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as egg products. Finally, Cal-Maine prepares its table-eggs and egg products to be picked up by customers, or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

78.     Cal-Maine's vertical reach extends even further: it maintains its own 10 million-bird breeder program, giving it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020 investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour."

79.     Defendant Rose Acre also has a breeder flock. Independent producers without breeder flocks must source replacement pullets either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly—Hendrix Genetics and EW Group—further narrowing their options. Hendrix Genetics and EW Group control the "parent flock," which produces the entire supply of pullets sold to downstream egg producers.

80.     This duopoly at the top of the supply chain functions as a structural chokepoint in the egg market which helps facilitate the producer-level conspiracy. The genetics firms, simply by acting in their own independent, profit-maximizing interest (i.e., restricting pullet supply to keep pullet prices high), have the effect of protecting the downstream collusive arrangement. Their actions, whether coordinated with producers or not, create a risk of input foreclosure, preventing other producers from easily expanding supply and stopping new entrants from competing away the supracompetitive egg prices.

81.     Moreover, smaller companies do not have equal access to rebuild their flocks as quickly as the most dominant firms.

## III.    Anticompetitive Conduct

82.     The U.S. egg industry typically saw stable prices with mild fluctuations, but since consolidating in the 1980s and 1990s, it has become less cyclical and more rigid in production. After supply shocks in 2020, Defendants allegedly broke this pattern and increased egg prices to record highs, reaching $6.23 per dozen in March 2025.

83.     Egg Producer Defendants claim HPAI outbreaks since late 2021 caused egg price increases, but the rises exceed what bird flu losses alone would justify. Instead, evidence suggests that these producers conspired to coordinate and manipulate pricing benchmarks, leading to higher egg prices.

**A.      Urner Barry and ECI Provide Egg Price Benchmarks**

84.      Unlike other agricultural commodities like soy, coffee, and sugar traded on transparent public exchanges, eggs lack a regulated exchange, and price discovery has effectively been delegated to (i) Defendant Urner Barry, which issues the "Urner Barry quote" or "UB quote" which serves as a *de facto* pricing benchmark for eggs nationwide, and (ii) to Defendant ECI, a members-only platform which publishes trading-based prices among producers and serves as an information exchange and contract-setting tool for large scale transactions.

85.      Most egg pricing is anchored to daily wholesale quotations published by Defendant Urner Barry in its Price-Current report, a trade publication that serves as the bellwether for egg contracts nationwide. Urner Barry also publishes benchmarks or indexes that condense its reported quotations into numeric benchmarks used in commercial contracts. Urner Barry's egg quotations (UB quotes) have been the industry's benchmark for over a century.

86.      Defendants and their co-conspirators were aware that Urner Barry's Price-Current reports and indexes served as the *de facto* bellwether for egg pricing.

87.      The overwhelming majority of wholesale egg contracts are based on Urner Barry's daily quotations as the reference price, meaning even small upward shifts in reported values immediately translate into higher prices for purchasers.

88.      Cal-Maine's SEC filings state that most conventional shell eggs in U.S. retail and foodservice channels are priced based on quoted wholesale market prices like those from Urner Barry.

89.      Urner Barry collects daily transaction data from producers, distributors, brokers, buyers—including the Egg Producer Defendants—and also references pricing from the Egg Clearinghouse. As managing editor Karyn Rispoli noted in a 2024 podcast, Egg Clearinghouse data is limited, which is why Urner Barry provides additional insights.

90.    Urner Barry's reporters collect data by telephone, e-mail, text message, and instant messaging from 8:45 a.m. to 5:00 p.m. Eastern each business day.

91.    Because virtually all commercial egg transactions reference Urner Barry's numbers, even modest movements in Urner Barry's daily quotation re-price billions of eggs in the pipeline. The leverage created by this centralization gave Defendants a powerful incentive to influence the benchmark.

92.    Urner Barry claims to use an IOSCO-compliant method that focuses on impartial and reliable pricing data. A spokesperson said, "We guard against manipulation by following the IOSCO methodology."

93.    Urner Barry is audited every year by accountancy firm BDO USA P.C. ("BDO") for compliance with IOSCO standards. While Urner Barry claims that it has "passed every audit," recent reports suggest that BDO is not a reliable accounting firm and has consistently failed to meet United States accounting standards. In 2023, "[t]wo-thirds of [BDO's] audits picked for inspection fell short of US standards."

94.    In addition to its daily market quotations, Urner Barry also publishes forward-looking egg market forecasts. These forecasts provide outlooks on future supply, demand, and pricing trends, drawing on predictive inputs such as eggs in incubators, chicks hatched, intended placements, rate of lay, along with other factors. Urner Barry advertises these reports as tools that allow subscribers to "identify trends before they happen" and "create sound business strategies."

95.    While less than 5 percent of the egg transactions occur on the ECI, the marketplace still plays an outsized role in Conventional Egg pricing, as Urner Barry incorporates transaction prices from ECI's spot market into its price quotes.

96.     The relatively small number of transactions on the ECI, combined with Defendants' dominant market position with respect to smaller producers, enabled the Egg Producer Defendants to easily influence the volume and pricing on the ECI platform, which are then incorporated into the Urner Barry quote. The dominant firms did not need to coordinate with hundreds of fringe producers. They only needed to coordinate among themselves in a way that artificially inflated the ECI prices.

97.     Additionally, the ECI is a member-only platform comprised of farmers and ECI's egg buyers board. Historically, the board included industry executives (including Cal-Maine's founder), underscoring close producer involvement in the information channel that feeds benchmarks.

98.     In these ways, Urner Barry and ECI amplify price swings led by the largest-volume producers and prevent independent, competitive decision-making by others.

**B.      Egg Producers Conspired to Artificially Increase the Price of Eggs Using Urner Barry Egg Price Indexes**

99.     Defendant Urner Barry's published daily wholesale quotations anchor egg pricing.

100.    This structural feature of the egg market ensures that any inflation in Urner Barry's benchmark prices rapidly transmit throughout the entire industry. Over 95 percent of eggs are sold pursuant to contracts pegged to Urner Barry's quotations, and fewer than 5 percent of eggs are sold on the ECI spot market (which Urner Barry also takes into account). Cal-Maine, for example, acknowledged in a press release that "a majority of [its] conventional eggs are sold based on market quotes published by Urner Barry." Thus, even modest artificial increases in reported prices cascade into higher prices for nearly every downstream transaction.

101.    Because Urner Barry's pricing is substantially based on self-reported transaction date from dominant firms, it is inherently susceptible to manipulation. By submitting elevated

prices, the Egg Producer Defendants can, and do, push Urner Barry's benchmark upward, knowing that the new higher prices will automatically be applied to future contract deliveries creating a self-reinforcing feedback loop—elevated benchmark prices increase the revenue received on each sale that, in turn, increases the baseline for the next round of reporting. The system thereby amplifies any upward movement and resists downward price corrections, particularly in a concentrated market where the largest players account for approximately 40 percent of all production.

102.    The opportunities for manipulation are exacerbated by the fact that most eggs sold in the U.S. are Conventional Shell Eggs, whose prices are almost universally tied to Urner Barry quotations. Specialty and cage-free eggs—whose prices are more often linked to actual production costs under long-term contracts—did not experience nearly the same magnitude of price spikes during the conspiracy period.

103.    For example, in the five months prior to the 2021 HPAI outbreak, cage-free eggs averaged $0.65 more per dozen than conventional eggs, reflecting higher production costs. By 2022, however, conventional egg prices—driven by Urner Barry indices—rose so sharply that *they exceeded cage-free prices by $0.33* on average. In 2023 and 2024, cage-free eggs were only 17% and 2% higher than conventional eggs, respectively.

104.    Defendants have blamed the spread of HPAI for higher eggs prices. In reality, however, HPAI does not explain the unprecedented surge in egg prices. This was not the first time the egg industry had been hit by a massive bird flu outbreak. The monthly reduction in the egg-laying flock size since 2022 was similar to those in 2015, when avian flu killed 43 million egg-laying hens. Nevertheless, prices since 2022 have risen *more than three times* more per lost hen than they did during the earlier outbreak.

105.    Data from the USDA, National Agricultural Statistics Service (NASS) and U.S. Bureau of Labor Statistics (BLS) Consumer Price Index Average Data for dozen large eggs, as shown in Figure 1, demonstrates the staggering price differences between the 2015 and 2022 outbreaks, and shows that the dramatic price hikes that began at the onset of the 2022 HPAI outbreak occurred in the face of relatively stable egg production compared to the more severe and prolonged shortage in 2015.



**Figure 1**[1]

106.    Average wholesale egg prices compared to egg-laying hen inventory lend further support to Defendants using the recent HPAI as a pretext to justify their coordinated pricing

---

[1] https://www.congress.gov/crs-product/IF12949#iag.aspx?prodCode=IF12949&iag=IAG-2074238648.

activity where, despite relatively stable inventory, wholesale egg prices have soared compared to those in 2015.



**Figure 2[2]**

107.    Historical precedent underscores the risks inherent in such a system. In the poultry and other meat industries, companies have been accused of using price reporting agencies like Urner Barry to facilitate anticompetitive information sharing.

108.    The same vulnerabilities exist in the egg market. Urner Barry's methodology allows for selective reporting, and the company does not verify every transaction reported by industry participants. Instead, it aggregates and "scrutinizes" the information according to its own proprietary methods, the details of which are not subject to public oversight.

109.    This opaque process invites abuse and the cartelization of the relevant market. The Egg Producer Defendants can monitor each other's reported prices, verify to coordinated price levels, and punish deviations by reverting to benchmarking-linked pricing in subsequent transactions.

---

[2] https://hntrbrk.com/big-egg/.

110. Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes. Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply—and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.

111. Indeed, from 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes.

112. Moreover, the Egg Producer Defendants were able to repopulate quickly relative to the 2015 outbreak due to their large size and vertical integration. For example, Cal-Maine lost a total of 3.7 million chickens to avian flu in two of its facilities in Kansas and Texas in December 2023 and April 2024, but by early November had added 8 million hens to its flock, more than recovering from its losses in just six months. In fact, Cal-Maine's total flock was actually 15% *higher* than it was before 2022.

113. A key distinction from the 2015 HPAI episode is the unusually slow recovery of the layer flock. This slow response may be explained by structural constraints in the pullet pipeline originating from the upstream genetics duopoly. During the 2022-2024 "crisis," the parent flock— which produces the replacement layer hens—was itself dramatically reduced, from 3.1 million in 2021 to 2.5 million in 2025.

114. This upstream bottleneck explains how a producer-led conspiracy could have remained durable. This "managed scarcity" prevented normal market correction (i.e., new entry or expansion) that would have otherwise competed away supracompetitive prices.

115.    Additionally, the actual domestic egg supply fell even less than the flock size, due to a significant reduction in egg export and an unprecedented increase in laying rate per hen, owing to improved genetics.

116.    The U.S. egg price spike is even more puzzling when compared to Europe, which also saw a massive supply shortage in 2022 after 50 million layers were depopulated — compared to 43 million in the U.S. And yet, prices only rose about 30% in Europe from January 2022 to January 2023, compared to nearly 170% in the U.S.

117.    The correlation between Urner Barry's quotations and conventional egg price spikes, combined with the absence of competitive market discipline, supports a strong inference that Defendants used the Urner Barry system to communicate, monitor, and enforce supracompetitive pricing.

118.    In this way, Urner Barry served as both the hub for exchanging competitively sensitive pricing information and the enforcement mechanism for maintaining elevated price levels. This dual role magnified the anticompetitive harm, depriving the marketplace of independent price setting and ensuring that the benefits of inflated prices accrued collectively to the Egg Producer Defendants.

119.    The vertical integration of the Egg Producer Defendants further strengthens the effectiveness of this arrangement. With control over breeding, production, processing, and distributions, these firms could maintain tight supply discipline while ensuring that all their sales— across all stages—reflected Urner Barry's elevated benchmarks.

120.    Because of the Defendants' market concentration, deviations from Urner Barry's benchmarks could be swiftly detected and addressed. Any short-term gain from discounting would

be outweighed by the risk of retaliation in future transactions, making adherence to coordinated prices the rational choice for all conspirators.

121. The resulting price increases have generated extraordinary profits for the Egg Producer Defendants. Cal-Maine, for example, reported gross margins approaching 40% during the conspiracy period, and in some quarters profits increased by nearly 950% compared to pre-2022 levels.

122. These profits came directly at the expense of egg purchasers, including Plaintiff and members of the Commercial Indirect Purchaser Classes, who paid vastly more for eggs than they would have in a competitive market.

123. The conduct described herein is inconsistent with unilateral, competitive behavior. It is instead indicative of a coordinated strategy, implemented through a centralized price reporting system, to fix, raise, and maintain egg prices at artificially high levels in violation of the Sherman Act and state antitrust and consumer protection laws.

### C. Input Price Increases Do Not Explain Egg Price Increases

124. Feed, primarily corn and soybean meal, is the primary cost component in shell egg production, which accounts for more than half of productions costs. Fuel costs, typically propane or natural gas, is another input to poultry farming.

125. Data from the U.S. Bureau of Labor Statistics show that these cost inputs have decreased since 2022.

126. Cal-Maine's financial disclosures confirm that production costs have gone down, not up, as Cal-Maine's profits have skyrocketed.

23

127. Under competition, one would expect price paths to track costs and supply shocks. That has not been the case in the shell egg market. Instead, prices and costs have diverged, to the profit of shell egg producers.

**D.    U.S. Department of Justice and New York Attorney General Investigations**

128. On March 6, 2025, various news outlets, including The Capitol Forum and The Wall Street Journal, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them "to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry.

129. In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing it stated that it received a civil investigative demand from DOJ in March 2025.

130. After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public those same eggs cost $3.03—a 62.7 percent decrease. Egg prices at retail also dropped around this time. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

## E.    Prior Actions Against Defendants

131.    The egg industry, including several of the Defendants named here, have previously been targeted by private litigants for anticompetitive and unfair business practices, including in *In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002 (E.D. Pa.), where Cal-Maine and Hillandale settled the claims for millions of dollars, and *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al*. (N.D. Ill.), where the jury returned a $17.8 million dollar verdict (before trebling) on Kraft's price fixing claim.

132.    Defendants have also been targeted by government enforcers. In 2020, the New York Attorney General alleged that Hillandale Farms exploited the COVID-19 pandemic to charge "unconscionably excessive" prices, justified by Urner Barry's indices, which themselves were based on data supplied by the industry. In 2021, Alaska accused Urner Barry of aiding broiler producers in an "anticompetitive output restriction scheme" by serving as a conduit for competitively sensitive information and facilitating production cuts.

## F.    Circumstantial Evidence Supporting the Conspiracy.

133.    Additional circumstantial evidence supports active collusion between and among the Defendants, as opposed to mere conscious parallelism, and lead to a strong inference of explicit collusion.

134.    As described above, Defendant Urner Barry compiles daily market reports by soliciting pricing information from producers, distributors, brokers, and buyers—including the Egg Producer Defendants—regarding transaction prices, bids, and offers. Egg producers, such as the Egg Producer Defendants, are able to maximize their prices by matching the benchmarks Urner Barry calculates based on the transaction data it receives. The data Urner Barry uses to calculate its benchmarks is data that would normally be kept confidential, given its competitively-sensitive

25

nature. Because an egg producer would be competitively disadvantaged by sharing private data unilaterally, a rational actor would only do so with the expectation that it will benefit from similar private information shared by its competitors. Moreover, since it is well known in the egg industry that over 95% of eggs are sold pursuant to contracts pegged to Urner Barry's price quotations, each individual Egg Producer Defendant can be reasonably certain that the other Egg Producer Defendants are supplying their competitively sensitive information to Urner Barry and are using the pricing benchmarks Urner Barry provides to maximize their egg prices.

135.    The risk of collusion is further heightened because Urner Barry disseminates forward-looking forecasts to its subscribers. By jointly relying on the same projections of future supply, demand, and pricing, the Egg Producer Defendants could align their expectations and production plans around shared market outlooks—coordinating not only current pricing but anticipated future conditions. Such forward-looking data magnifies the anticompetitive potential of Urner Barry's system by enabling the Egg Producer Defendants to adjust production and pricing behavior in parallel based on common forecasts.

136.    Urner Barry provides participating egg producers with a price-verification scheme, or "the practice of a seller reporting to its competitors the details of completed transactions with specific customers." With Urner Barry, egg producers, such as the Egg Producer Defendants, are able to see benchmarks that measure where an egg producer stands in relation to others in their market. These benchmarks are based on actual transactions. This type of price-verification makes little sense absent collusion.

137.    Urner Barry provides egg producers, including the Egg Producer Defendants, with a motive to conspire by advertising that Urner Barry provides valuable information to support maximizing profits.

26

138.    Conventional Shell Eggs are a fungible commodity with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

139.    Government grading standards make Conventional Eggs functionally identical, eliminating non-price competition and simplifying the detection of price deviations.

140.    Conventional Shell Eggs also exhibit relatively inelastic demand— i.e., consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period.

141.    As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter. A $1-$2 increase in an item we purchase once a month is not that big of deal in the grand scheme of things."

142.    Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Small artificial reductions in supply can yield disproportionately large increases in price and profit for producers, including Defendants.

143.    Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. The Egg Producer Defendants are members of UEP and AEB (American Egg Board), national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring

together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

144. For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

145. Moreover, employees of the Egg Producer Defendants have been on the board of UEP. For instance, In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

146. Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in *Kraft* was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs. UEP Certified is still in force today.

147. Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period, including employees of Rose Acre, Daybreak, and Urner Barry. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development." Employees of Defendants have even been seen together at these conferences. Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a guest speaker at the conference. Finally, Defendants, including at least Cal-Maine, have sponsored this event in the

28

past. Trade association membership and industry events provide Defendants opportunities to collude.

148.    The egg market is increasingly becoming more concentrated. While the industry was once highly fragmented, in recent years large egg producers, including the Egg Producer Defendants, have grown exponentially through acquisitions. A conspiracy is easier to effectuate, maintain, and enforce in a more concentrated industry.

149.    Egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs. Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment. Potential new entrants would also need to displace long-standing customer relationships. Thus, new entrants into the market are unlikely to discipline cartel pricing.

### ANTITRUST INJURY & RELEVANT ANTITRUST MARKET

150.    Defendants' anticompetitive conduct had the following effects, among others:

- Competition among the Egg Producer Defendants has been restrained or eliminated with respect to egg prices;

- The price of eggs has been fixed, stabilized, or maintained at artificially high levels; and

- Individuals have been deprived of free and open competition.

- Purchasers of eggs have paid artificially inflated prices.

151.    Generally accepted economic principles dictate that an overcharge at the top of a multi-level distribution chain will result in higher prices at every level of distribution below.

29

Therefore, at least some portion of an anticompetitive overcharge will be passed on by intermediaries, such as distributors, to end users.

152. Here, while direct purchasers of Conventional Shell Eggs were the first to pay supra-competitive prices, some or all of the overcharges were passed along the distribution chain and absorbed by downstream purchasers, including Plaintiff and class members, when they purchased Conventional Shell Eggs from distributors, wholesalers, or retailers for commercial use.

153. These overcharges are exactly the type of injuries the state antitrust and consumer protection laws were intended to forestall.

154. Plaintiff and the class members have sustained injury to their business or property, as a result of Defendants violations of the state antitrust and consumer protection laws.

155. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the overcharge passed through the various levels of distribution. As a result, the economic harm to Plaintiff and class members can be readily quantified.

## I.    The Relevant Product Market Is Conventional Shell Eggs

156. The relevant product market is the market for Conventional Shell Eggs, also known as "table eggs." Shell eggs are fresh, uncooked, and in an intact shell. Most shell eggs are sold at retail outlets such as grocery and convenience stores.

157. According to the USDA, in 2023, approximately 70% of eggs produced in the United States were sold as shell eggs. The remaining 30% of eggs produced in the United States were sold as egg products (i.e. shell eggs broken and sold in liquid, frozen, or dried form.

158. Shell eggs are versatile and can be used in a wide range of culinary applications, including baking, frying, boiling, poaching, and scrambling. Because shell eggs are purchased fully intact, there are no limits to their culinary applications. Previously broken egg products like

30

liquid eggs are often pre-mixed to combine the yolk and whites. By mixing the yolk and the whites, egg products' culinary applications are generally limited to making scrambled egg and the preparation of certain baked goods.

159.    Additionally, many egg consumers prefer the flavor and texture of freshly-cracked shell eggs over egg products. Egg buyers also value shell eggs because they generally do not contain additives, preservatives, or stabilizers, like egg products.

160.    "Conventional" shell eggs are differentiated from "specialty" shell eggs which include cage-free, organic, brown, free-range, pasture-raised, or nutritionally enhanced shell eggs. Conventional shell eggs make up the majority of shell eggs sold in the United States. In 2024, conventional shell eggs held almost three-quarters of the U.S. shell egg market, followed by cage-free eggs at about 23.2 percent, and pasture-raised at less than five percent.

161.    Accordingly, there are no reasonable substitutes for Conventional Shell Eggs and they constitute a distinct product market.

## II.    The Relevant Geographic Market is National

162.    The relevant geographic market is the United States. The Egg Producer Defendants produce and distribute eggs through locations across the United States and have increased egg prices nationwide.

## TOLLING OF STATUTE OF LIMITATIONS

163.    Plaintiff and members of the Commercial Indirect Purchaser Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

164. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Commercial Indirect Purchaser Classes.

165. Plaintiff and members of the Commercial Indirect Purchaser Classes had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when news of the DOJ's investigation into egg prices broke.

166. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Commercial Indirect Purchaser Classes has been tolled during the period of such fraudulent concealment.

## CLASS ALLEGATIONS

167. Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2) on behalf of itself and as representative of a class of Commercial Indirect Purchasers seeking injunctive relief (the "Nationwide Injunctive Relief Commercial Indirect Class") defined as follows:

> All persons or entities who indirectly purchased Conventional Shell Eggs from the Defendants and their co-conspirators in the United States from January 1, 2022, and to the present for their own business use in commercial food preparation.

168. In addition, Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of itself and all others similarly situated seeking damages as well as equitable relief, on behalf of the following class (the "Commercial State Law Damages Class"):

> All persons or entities who indirectly purchased Conventional Shell Eggs from the Defendants or co-conspirators in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, South Carolina, Tennessee, Utah, Vermont, West

Virginia, and Wisconsin from January 1, 2022 to the present for their own business use in commercial food preparation.

169.    Specifically excluded from both the Nationwide Injunctive Relief Commercial Indirect Class and the Commercial State Law Class (collectively, the "Commercial Indirect Purchaser Classes") are: Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his or her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

170.    Plaintiff reserves the right to modify these definitions or to propose subclasses, as appropriate, based on further investigation and discovery.

171.    **Numerosity**: The members of the Commercial Indirect Purchaser Classes are so numerous that joinder of all members would be impracticable. The exact number of class members in the Commercial Indirect Purchaser Classes is unknown to Plaintiff at this time, but it is estimated to be in the millions. The members of the Commercial Indirect Purchaser Classes should be readily identifiable from existing records.

172.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Commercial Indirect Purchaser Classes because they were all similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for eggs purchased indirectly from one or more of the Producing Defendants or their producer co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Commercial Indirect Purchaser Classes.

173.    **Adequacy**: Plaintiff will fairly and adequately represent the interests of the members of the Commercial Indirect Purchaser Classes. Plaintiff's interests are coincident with,

33

and not antagonistic to, those of the other class members. Plaintiff is represented by attorneys experienced in the prosecution of class action litigation generally, and in antitrust litigation specifically, who will vigorously prosecute this action on behalf of the Commercial Indirect Purchaser Classes.

174.    **Common Questions of Law and Fact Predominate**: Questions of law and of fact common to the members of the Commercial Indirect Purchaser Classes predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to all class members. Common issues of fact and law include, but are not limited to, the following:

  a.  Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of Conventional Shell Eggs in the United States;

  b.  Whether such combination or conspiracy constituted violations of the Sherman Antitrust Act;

  c.  Whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

  d.  Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiff and other members of the Commercial Indirect Purchaser Classes;

  e.  Whether Defendants caused Plaintiff and the members of the Commercial Indirect Purchaser Classes to suffer damages in the form of overcharges on Conventional Shell Eggs indirectly purchased from the Defendants or their producing co-conspirators;

  f.  The effect of Defendants' conspiracy on Conventional Shell Eggs sold in the United States during the Class Period;

  g.  The identity of the participants of the alleged conspiracy;

  h.  The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

  i.  Whether Defendants fraudulently concealed their misconduct;

j.  Whether Defendants' anticompetitive scheme inflated prices of Conventional Shell Eggs above competitive levels;

k.  The appropriate measure of class-wide damages for the Commercial Indirect Purchaser Classes; and

l.  The nature and scope of injunctive relief necessary to restore competition in the Conventional Shell Eggs market.

175.  **Superiority**: A Class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons with a method for obtaining redress on claims that could not practicably be pursued individually. Moreover, the prosecution of separate actions by individual members of the Commercial Indirect Purchaser Classes would create a risk of inconsistent or varying adjudications, potentially establishing incompatible standards of conduct for Defendants. Plaintiff knows of no manageability or other issue that would preclude maintenance of this case as a class action.

176.  **Injunctive Relief**: Defendants have acted or refused to act on grounds generally applicable to the members of the Commercial Indirect Purchaser Classes, making injunctive and corresponding declaratory relief appropriate with respect to these classes as a whole pursuant to Federal Rule of Civil Procedure 23(b)(2).

### CLAIMS FOR RELIEF

### COUNT I
**Price Fixing in Violation of the Sherman Act (15 U.S.C. §§ 1, 3)**
(On behalf of Nationwide Class for Injunctive and Equitable Relief)

177.  Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs, as though fully set forth herein.

35

178.    From at least January 1, 2022, and continuing through the present, the Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

179.    The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of Conventional Shell Eggs in the United States and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

180.    Defendants' conspiracy has had the following effects, among others: (a) price competition in the market for Conventional Shell Eggs has been restrained, suppressed, or eliminated; (b) prices for Conventional Shell Eggs produced by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; (c) Plaintiff and members of the Class who purchased Conventional Shell Eggs indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) purchasers of Conventional Shell Eggs paid artificially inflated prices.

181.    Defendants' activities constitute a *per* se violation of Sections 1 and 3 of the Sherman Act.

182.    Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

36

183.    Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid for Conventional Shell Eggs in the United States.

184.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Conventional Shell Eggs.

185.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II
### Information Exchange in Violation of the Sherman Act (15 U.S.C. §§ 1, 3)
(On behalf of Nationwide Class for Injunctive and Equitable Relief)

186.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs, as though fully set forth herein.

187.    From at least January 1, 2022, and continuing through the present, the Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

188.    The contract, combination or conspiracy consisted of agreement to exchange competitively sensitive information about their operations, causing anticompetitive effects without sufficient procompetitive justifications.

189.    The information exchange has had the following effects, among others: (a) price competition in the market for Conventional Shell Eggs has been restrained, suppressed, or eliminated; (b) prices for Conventional Shell Eggs produced by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; (c) Plaintiff and members of the Class who purchased Conventional Shell Eggs indirectly from Defendants and their co-conspirators have

been deprived of the benefits of free and open competition; and (d) purchasers of Conventional Shell Eggs paid artificially inflated prices.

190.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Conventional Shell Eggs.

191.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful per se. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

192.    Defendants' unlawful information exchange directly, substantially, and foreseeably increased prices that purchasers paid for Conventional Shell Eggs in the United States.

193.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on Conventional Shell Eggs.

194.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III
**Violations of State Antitrust Statutes – Price Fixing and Unlawful Information Exchange**
(On behalf of Plaintiff and the Commercial State Law Damages Class)

195.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs, as though fully set forth herein.

196.    During the Class Period, Defendants engaged in continuing contracts, combinations, or conspiracies with respect to the sale of Conventional Shell Eggs in unreasonable

38

restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

197.    One contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, or maintain at artificially supra-competitive prices for Conventional Shell Eggs in the United States and its territories.

198.    A second contract, combination or conspiracy consisted of agreement to exchange competitively sensitive information about their operations, causing anticompetitive effects without sufficient procompetitive justifications.

199.    As a result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for Conventional Shell Eggs than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is  the type of harm the antitrust laws of the states included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

200.    Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

201.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes:

202.    **Alabama**: Defendants have entered into unlawful agreements in restraint of trade in violation of Ala. Code § 6-5-60, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Alabama; (2) Conventional Shell Egg prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Alabama; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ala. Code § 6-5-60.

203.    **Arizona**: Defendants have entered into an unlawful agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Arizona; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

204.    **California**: Defendants have entered into unlawful agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq*. Defendants' conspiracies alleged herein has had the following effects: (1) price competition for Conventional Shell Eggs has been restrained, suppressed, or eliminated in the State of California; (2) Conventional Shell Egg prices were fixed, raised, stabilized, and pegged at artificially high, non-competitive levels throughout California; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for

Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected California commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Cal. Bus. & Prof. Code §§ 16720 *et seq*.

205.    **Colorado**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. §§ 6-4-104, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Colorado; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Colo. Rev. Stat. §§ 6-4-104, *et seq*.

206.    **Connecticut**: Defendants have entered into unlawful agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Connecticut; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, *et seq*.

41

207.    **District of Columbia**: Defendants have entered into unlawful agreements in restraint of trade in violation of D.C. Code §§ 28-4501, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §§ 28-4501, *et seq*.

208.    **Hawaii:** Defendants have entered into unlawful agreements in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Hawaii; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Haw. Code §§ 480-1, *et seq*.

209.    **Illinois**: Defendants have entered into unlawful agreements in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was

42

restrained, suppressed, and eliminated throughout Illinois; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

210.    **Iowa**: Defendants have entered into unlawful agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Iowa; (2) Conventional Shell Egg prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

211.    **Kansas**: Defendants have entered into unlawful agreements in restraint of trade in violation of Kan. Stat. §§ 50-101, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Kansas; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period,

43

Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §§ 50-101, *et seq*.

212.    **Maine**: Defendants have entered into unlawful agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101 *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Maine; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1104.

213.    **Michigan**: Defendants have entered into unlawful agreements in restraint of trade in violation of Mich. Comp. Laws §§ 445.771, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Michigan; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §§ 445.771, *et seq*.

214.    **Minnesota**: Defendants have entered into unlawful agreements in restraint of trade in violation of Minn. Stat. §§ 325D.49, *et seq*. Defendants' conspiracies had the following effects: (1) Price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Minnesota; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §§ 325D.49, *et seq*.

215.    **Mississippi**: Defendants have entered into unlawful agreements in restraint of trade in violation of Miss. Code §§ 75-21-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Mississippi; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code §§ 75-21-1, *et seq*.

216.    **Nebraska**: Defendants have entered into unlawful agreements in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and

45

eliminated throughout Nebraska; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §§ 59-801, *et seq*.

217.    **Nevada**: Defendants have entered into unlawful agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Nevada; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

218.    **New Hampshire**: Defendants have entered into unlawful agreements in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout New Hampshire; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and

46

(4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

219.     **New Mexico**: Defendants have entered into unlawful agreements in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout New Mexico; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

220.     **New York**: Defendants have entered into unlawful agreements in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' conspiracies had the following effects: (1)  price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout New York; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available

under New York General Business Laws §§ 340, *et seq*.

221.    **North Carolina**: Defendants have entered into unlawful agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout North Carolina; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes §§ 75-1, *et seq*.

222.    **North Dakota**: Defendants have entered into unlawful agreements in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout North Dakota; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq*.

223.    **Oregon**: Defendants have entered into unlawful agreements in restraint of trade in violation of Or. Rev. Stat. §§ 646.725, *et seq*. Defendants' conspiracies had the following

48

effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Oregon; (2) Conventional Shell Egg prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. §§ 646.780, *et seq*.

224.    **Rhode Island**: Defendants have entered into unlawful agreements in restraint of trade in violation of Rhode Island General Laws §§ 6-36-4, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Rhode Island; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws §§ 6-36-11, *et seq*.

225.    **South Dakota**: Defendants have entered into unlawful agreements in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout South Dakota; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3)

49

members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

226.    **Tennessee**: Defendants have entered into unlawful agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Tennessee; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

227.    **Utah**: Defendants have entered into unlawful agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Utah; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

50

Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

228.    **Vermont**: Defendants have entered into an unlawful agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2453, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Vermont; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2465, *et seq*.

229.    **West Virginia**: Defendants have entered into unlawful agreements in restraint of trade in violation of West Virginia Code §§ 47-18-3, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout West Virginia; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-9, *et seq*.

230.    **Wisconsin**: Defendants have entered into unlawful agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Wisconsin; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §§ 133.01, *et seq*.

**COUNT IV**
**Violation of State Consumer Protection Statutes –**
**Price Fixing and Unlawful Information Exchange**
(On behalf of Plaintiff and the Commercial State Law Damages Class)

231.    Plaintiff incorporates and realleges, each allegation set forth in the preceding paragraphs, as though fully set forth herein.

232.    During the Class Period, Defendants engaged in unfair competition or unfair, or unconscionable acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

233.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members were injured and are threatened with further injury.

234.    Defendants' anticompetitive acts, described herein, constitute violations of the following state consumer protection laws:

235.    **Arkansas**: Defendants have knowingly entered into an unlawful, unfair, and unconscionable agreements in restraint of trade in violation of Ark. Code Ann. §§ 4-88-101, *et*

52

*seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Arkansas; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, and unconscionable conduct substantially impacted commerce in Arkansas. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute.

236. **California**: Defendants have engaged in unfair competition, unfair and unlawful acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Defendants' unfair and unlawful conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout California; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful and unfair conduct substantially impacted commerce in California. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute.

237. **Florida**: Defendants have engaged in unfair trade, unfair, or unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Florida; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Florida; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful and unconscionable conduct substantially impacted commerce in Florida. Accordingly, Plaintiff and Class members seek all forms of available relief under Fla. Stat. §§ 501.201, *et seq*.

238. **Hawaii**. Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation in violation of Haw. Rev. Stat. § 480-2. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Hawaii; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Hawaii. Accordingly, Plaintiff and Class members seek all forms of available relief under Haw. Rev. Stat. § 480-2.

239. **Illinois**. Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Illinois; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the

Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Illinois. Accordingly, Plaintiff and Class members seek all forms of available relief under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

240. **Minnesota**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Minnesota Consumer Protection Act, Minn. Stat. § 325F.69, *et seq.* Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Minnesota; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Minnesota. Accordingly, Plaintiff and Class members seek all forms of available relief under Neb. Rev. Stat. § 59-1601, *et seq.*

241. **Nebraska**: Defendants have engaged in unfair competition, unfair or unconscionable acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Nebraska; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Nebraska. Accordingly, Plaintiff and Class members seek all forms of available relief under Neb. Rev. Stat. § 59-1601,

*et seq.*

242.    **Nevada:** Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Nevada Deceptive Trade Practices Act. Nev. Stat. § 598.0923, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Nevada; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Nevada. Accordingly, Plaintiff and Class members seek all forms of available relief under Nev. Stat. § 598.0923, *et seq*.

243.    **New Mexico**: Defendants have engaged in unfair competition, unfair unconscionable acts or practices in violation of New Mexico Stat. §§ 57-12-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout New Mexico; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, and unconscionable conduct substantially impacted commerce in New Mexico. Accordingly, Plaintiff and Class members seek all forms of available relief under N.M. Stat. §§ 57-12-1, *et seq*.

244.    **North Carolina**: Defendants have engaged in unfair competition, unfair, or

56

unconscionable in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout North Carolina; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in North Carolina. Accordingly, Plaintiff and Class members seek all forms of available relief under this statute. N.C. Gen. Stat. §§ 75-1.1, *et seq.*

245.    **Rhode Island**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act. R.I. Gen. Laws §§ 6-13.1-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Rhode Island; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Rhode Island. Accordingly, Plaintiff and Class members seek all forms of available relief under R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

246.    **South Carolina**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq*. Defendants' conduct has had the following effects: (1) price

competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout South Carolina; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in South Carolina. Accordingly, Plaintiff and Class members seek all forms of available relief under S.C. Code Ann. §§ 39-5-10 *et seq*.

247. **Vermont**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout Vermont; (2) Conventional Shell Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Vermont. Accordingly, Plaintiff and Class members seek all forms of available relief under 9 Vermont Stat. Ann. §§ 2451, *et seq*.

248. **West Virginia**: Defendants have engaged in unfair competition, unfair, or unconscionable acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code §§ 46A-6-101, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Conventional Shell Eggs was restrained, suppressed, and eliminated throughout West Virginia; (2) Conventional Shell Egg prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Conventional Shell Eggs. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in West Virginia. Accordingly, Plaintiff and Class members seek all forms of available relief under W.Va. Code §§ 46A-6-101, *et seq*.

## COUNT V
### Unjust Enrichment
(On Behalf of Plaintiff and the Commercial State Law Damages Class)

249.    Plaintiff incorporates and realleges, as though fully set forth herein, each allegation set forth in the preceding paragraphs.

250.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.[3]

251.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices, and unlawful profits on sales of eggs.

252.    Defendants have benefitted from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the Class Members for eggs.

253.    Plaintiff and the Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the Class Members are

---

[3] Unjust enrichment claims are alleged under the laws of the following states: Alabama, Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Class may make claims on a pro rata basis.

254.    Pursuit of any remedies against the firms from whom Plaintiff and the Class purchased eggs subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PETITION FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court grant judgment against Defendants as follows:

1.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein;

2.    Plaintiff and the Damages Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

3.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution or disgorgement of profits unlawfully obtained;

4.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a pro rata basis;

5.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

7.    Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.    Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.    Any other relief as the case may require and the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff requests a trial by jury of all issues so triable.

Dated: May 6, 2026                          Respectfully submitted,

By: */s/ Mark A. Solheim*

Mark A. Solheim  (WI #1028001)
Shawn M. Raiter (WI #1022977)
**LARSON KING, LLP**
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
Telephone: (651) 312-6500
msolheim@larsonking.com
sraiter@larsonking.com

Garrett D. Blanchfield (*pro hac vice forthcoming*)
Brant D. Penney (*pro hac vice forthcoming*
Roberta A. Yard (*pro hac vice forthcoming*)
**REINHARDT WENDORF & BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN  55402
Tel: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

61

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes (*Pro Hac Vice* forthcoming)
Jeffrey J. Corrigan (*Pro Hac Vice* forthcoming)
Jeffery L. Spector (*Pro Hac Vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
BCaldes@srkattorneys.com
JCorrigan@srkattorneys.com
JSpector@srkattorneys.com
saldridge@barrettlawgroup.com

*Attorneys for Plaintiff and the Proposed Classes*

62